FILED
IN CLERKS OFFICE
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Case No. 05-11771-NMG 12: 3 ¹

BAHIG F. BISHAY,
    Claimant
    v.

AMERICAN ARBITRATION ASSOCIATION,
Dispute Resolution Service Worldwide;

and

BRIGHTON AVENUE ASSOCIATES, LLC.,
    Respondent

)
)
)
)
)
)
)
)
)
)
)
)

U.S. DISTRICT COURT
DISTRICT OF MASS.
American Arbitration Association
Case No. 11 115 Y 01777 03

## CLAIMANT'S MOTION TO EXTEND TIME TO FILE OPPOSITION TO BRIGHTON AVENUE ASSOCIATES, LLC'S MOTION TO DISMISS

Now comes Claimant Bahig Bishay (hereafter "Bishay"), and respectfully requests this

Honorable Court to allow him one week extension to file his Opposition to Respondent Brighton

Avenue Associates, LLC's (hereafter "BAA") Motion to Dismiss Bishay's Application-

Complaint, which Bishay filed with this Court on August 26, 2005; the US Marshal served BAA

on September 14, 2005; and BAA filed its Motion to Dismiss on October 3, 2005, and mailed a

copy to Bishay via First Class Mail.

The grounds for this Motion is that Bishay recently had a medical family emergency and

was otherwise unable to complete and file his Opposition within the 14-days required. Also, the

primary Defendant in this case, American Arbitration Association (hereafter "AAA"), only filed

its answer to Bishay's Application-Complaint, in the form of Motion to Dismiss, on/about

October 11, 2005.

Bishay does not believe that judicial economy or efficiency will be compromised, as the

Court will be able to review the entire package all at once, and particularly the issues raised by the primary Defendant, AAA, and Bishay's Opposition to same.

WHEREFORE, Bishay respectfully requests this Court to grant the one week extension referenced herein, and grant any other such relief this Court deems just.

Respectfully submitted

Bahig F. Bishay,
Pro se

Dated this 20th day of October, 2005

Bahig F. Bishay
163 Blue Hill Drive
Westwood, MA 02090
Phone: 781.326.3310
Fax: 781.326.6690

## CERTIFICATE OF SERVICE

I hereby certify that I served true and accurate copy of this document on all counsels of record, by First Class Mail, pre-paid postage, this day 20th, October, 2005.



Bahig Bishay

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 OCT 20 ⌐ 12: 31

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| BAHIG F. BISHAY, | ) |
| Claimant | ) |
| v. | ) |
|  | ) |
| AMERICAN ARBITRATION ASSOCIATION, | ) |
| Dispute Resolution Service Worldwide; | ) |
|  | ) |
| and | ) |
|  | ) |
| BRIGHTON AVENUE ASSOCIATES, LLC., | ) |
| Respondent | ) |

05 CV 11771 NMG

American Arbitration Association

Case No. 11 115 Y 01777 03

### CLAIMANT'S OPPOSITION TO BRIGHTON AVENUE ASSOCIATES, LLC'S MOTION TO DISMISS CLAIMANT'S APPLICATION-COMPLAINT FILED PURSUANT TO U.S. ARBITRATION ACT-TITLE 9

Now comes Claimant Bahig F. Bishay (hereafter "Bishay") and opposes Respondent

Brighton Avenue Associates LLC's (hereafter "BAA") Motion to Dismiss. And while Bishay

believes that his Opposition filed in response to another Motion to Dismiss submitted by the

primary Defendant, American Arbitration Association (hereafter "AAA"), makes BAA's present

Motion moot for variety of reasons set forth therein – citing, primarily, that the fundamental

relief available to remedy the present circumstances where the subject awards were procured

through *corruption, fraud or undue means,* with the full meaning stated in U.S. Arbitration Act

Title 9 & M.G.L. Chapter 251, Sections 12&15, is nothing less than vacating such bogus

award[s] – Bishay provides the following limited response -- noting that *corruption, fraud or*

*undue means* are not a novel topic to BAA's founder and majority owner, Mr. Harold Brown[1].

---

[1] As reflected in the attached public articles, "bribing" state and/or city officials, for example, is one of the specific *corruption* schemes previously orchestrated by Mr. Harold Brown, whom Bishay trusts is not a stranger to the court system, particularly during the past three decades -- and the related land mark convictions issued during that period of time. [See Exhibit-1]

As reflected in Bishay's Application (at ¶ 4), Bishay expected that BAA might spend a great deal of effort (as now confirmed by the 18-page Motion filed by BAA), to assist AAA's Case Manager Paula C. Dubois (hereafter "Dubois") in escaping such serious charges by introducing one hyper-technical alibi after another to confuse the Court; make this serious matter go away; and avoid paying Bishay millions of dollars in the process -- as Bishay wrote: "*the Respondent might seek in an attempt to exonerate AAA's Case Manager Paula C. Dubois from such acts -- which this Court ought not distinguish from common-law fraud, corruption and undue means intended to deprive Bishay from receiving more than $5.0 million*" – it is clear now that BAA did just what Bishay had expected of BAA and its founder and majority owner, Mr. Harold Brown. In fact, BAA, its founder Harold Brown, and its counsel James Singer, recently attempted to introduce similar hyper-technical alibis before the Suffolk jury in a related action brought by Bishay against BAA, during a week-long jury trial, but the jury did not buy into these alibis and returned a more than $1.0 million verdict against BAA. [See Exhibit-2]

While it is for another day and hopefully before a different forum that a determination will eventually be made as to whether it was BAA, its counsel, or someone else – that/who actually orchestrated the preparation of the bogus award (or awards), which were delivered to Bishay by AAA's Case Manager Dubois -- Bishay respectfully urges this Honorable Court not to be lured by BAA's hyper-technical barrage of alibis, which are simply and carefully designed to distract this Court's[2] attention from the central issue and the only relief and remedy available pursuant to U.S. Arbitration Act Title 9 & M.G.L. Chapter 251, Sections 12&15.

---

[2] Shortly after filing the subject Application with this Court pursuant to U.S. Arbitration Act-Title 9, to err on the side of caution, however, and based on the well documented legal history of the Respondent's owner, Harold Brown, Bishay paid the additional fee and filed a back-up Application in the state court. Bishay, however, remains convinced that this Court has the ultimate required jurisdiction to vacate the bogus award[s] based on the diversity of citizenships between the primary parties: Bishay, on one hand, who is a resident of Massachusetts, and American Arbitration Association, on the other hand, which is an entity organized under the laws of the state of New York. In any event, Bishay is committed to dismiss his state court Application once this Court grants the relief sought herein.

To assist this Court in sorting through the various hyper-technical alibis offered by BAA, and misstated facts[3], however, Bishay provides the following brief responses:

**1. BAA is complaining that Bishay filed this Application *pro se*.** For all the obvious reasons as more detailed in the state court's *Memorandum of Decision and Order* dated December 30, 2004, copy of which is annexed hereto as Exhibit-2, Bishay does not currently have the financial resources to hire yet more attorneys, primarily because BAA appealed the more than $1.0 million jury award returned in Bishay's favor, which was affirmed by the 19-page carefully written *Memorandum of Decision and Order* issued by the state court in December 2004. In fact, it was BAA that squeezed Bishay into such untenable[4] financial demise which left Bishay with no choice but to either file his Application with this Court in August *pro se*, or lose the opportunity of ever being able to fully prosecute his claims against BAA.

**2. BAA alleges that the awards already delivered by Dubois reflect a unanimous decision by all three arbitrators.** The obvious fallacy in this disjointed argument is that the central issue now before this Court is precisely the fact that at least one of the arbitrators' award[s] was tampered with, with more to evaluate in due course, which Bishay expects will follow the same discovery and ultimate conclusion. But again, and regardless of whether Bishay has unearthed one bogus award, two or three, this should not in any way sway this Court's focus from the issue at hand, which is *corruption, fraud, or undue means* occurred – regardless of whether such acts were unearthed singularly or in plural.

---

[3] For example, the Agreement dated January 12, 2001, clearly contemplated the development of a total of 250,000, which included approximately 60,000 square feet of existing retail space (i.e. another 190,000 square feet to be developed, and **not** the "additional" 250,000 BAA disingenuously now suggests in an attempt to sneak in this erroneous statement and accuse Bishay for not objecting to same during the next round of arbitration proceedings).

[4] Not satisfied with putting Bishay out of business in 2001, as discussed in the state court's *Memorandum of Decision and Order* annexed hereto as Exhibit-2, BAA's activities forced Bishay into a state receivership, individually, and BAA also managed to keep Bishay in said receivership for four years – as Bishay continues to be held hostage in the same receivership as of this writing – and the only way out for Bishay is to collect the millions BAA owes him.

Moreover, BAA has not, and clearly cannot challenge Bishay's allegations that the subject award[s], which Dubois delivered to Bishay in June, 2005, were in fact not executed by the designated arbitrators as purported by the sworn statements appearing under the alleged signature of each arbitrator -- deeming the awards delivered to Bishay bogus and otherwise *procured through corruption, fraud and/or undue means,* with the full meaning established in Title-9 of the U.S. Arbitration Act.

**3. BAA alleges that this Court lacks subject matter jurisdiction.** Bishay needs not convince this Court that it indeed possesses the required subject matter jurisdiction because of the obvious diversity of citizenship between the primary parties: Bishay, on one hand, who is a resident of Massachusetts; and AAA, on the other hand, which is a corporate entity organized under the laws of the state of New York. BAA, on the third hand, is not the party responsible (at least at this juncture) that delivered the bogus award[s] to Bishay in June, 2005 – it was AAA's Case Manager, Dubois. Moreover, U.S. Arbitration Act, Title-9 cannot be more suitable to resolve this dispute than any state law otherwise available.

**4. BAA alleges that Bishay failed to state a claim upon which relief can be granted.** As stated throughout all the pleadings thus far, Bishay requested this Court to grant the only appropriate and available relief pursuant to U.S. Arbitration Act Title 9 & M.G.L. Chapter 251, Sections 12&15. To this end, Bishay respectfully directs this Court's attention to the same answer Bishay provided in his Opposition to AAA's Motion to Dismiss.

**5. BAA alleges that Bishay has not yet proved fraud with more specificity.** With the limited documents produced by AAA thus far, Bishay indeed provided more than ample demonstration of at least one bogus award. And in the event this Court postpones the annulment of all related awards in this case, which Bishay does not believe is necessary or even expected

based on the specific relief available pursuant to U.S. Arbitration Act Title 9 & M.G.L. Chapter 251, Sections 12&15, Bishay will gladly take the appropriate steps to further examine the balance of the documents and report to this Court his further findings – providing, of course, that this Court orders AAA & arbitrators to come forth with the documents Bishay already requested.

**6. Contrary to the specific sworn authentication statement appearing above each arbitrator's signature line, BAA now has the temerity to suggest that someone other than the specifically named arbitrator can in fact sign on behalf of said arbitrator.** Bishay does not believe this allegation deserves addressing, as the sworn statements appearing above the actual required signature of each arbitrator in this case, are clear, unambiguous and require no further explanation – and if such silly proposition endures, which Bishay trusts will not, it would stand the laws governing all such "*sworn statements*" right on their heads.

**7. BAA appears to suggest that this Court should somehow look the other way if *corruption, fraud or undue means* were perpetrated in connection with one panel member's award, and not all three.** Because Bishay believes that this preposterous argument will be rejected by this Court on its face, Bishay will not take up this Court's time now to further address this silly argument.

**8. BAA accuses Bishay for failing to procure separate sown affidavits from each arbitrator, respecting the authenticity (or lack thereof) of the awards Dubois delivered to Bishay.** Again, what BAA's counsel failed to understand is that Bishay already made similar demands on the three arbitrators as reflected in Exhibits J, K and L, which are attached to Bishay's Application, but all three arbitrators refused to get involved in this potentially serious liability for all the obvious reasons (most attorneys stay, as far away as possible, from "fraud", unless they are ordered by a court to take the stand and produce their work-product – which

5

Bishay had already requested).

**9. BAA alleges that the commencement of action was untimely, as Bishay**

**purportedly waited 71-days to file his Application.** This assumption is totally inappropriate

because AAA only agreed to provide limited documents to Bishay on July 29, 2005, following

which Bishay consulted with third-parties as to the authenticity, or lack thereof, of the various

signatures of the Chair-person, Carla Cox – as AAA refused to furnish the balance of the

documents Bishay requested in his demand letters sent to AAA and the three arbitrators on July

21 & 22, 2005 (and it remains to be seen as to whether such refusal constituted *obstruction of*

*justice*, in due course), as reflected in Exhibits I, J, K and L, annexed to Bishay's Application

which was indeed filed in this Court within less than 30-days (and not the 90-days allowed

pursuant to U.S. Arbitration Act, Title-9) from the time Bishay became aware that *corruption,*

*fraud or undue means* existed. Also, within the same 30-days allowed pursuant to M.G.L.

Chapter 251, Section 12&15, Bishay filed a similar Application with the state court, to err on the

side of caution and withdraw same, forthwith, if this Court granted the relief sought.

As Bishay explained in his Application, he has not been able to review the balance of all

signatures available to AAA, or in the hands of the three arbitrators, to fully demonstrate to this

Court the widespread disparity throughout this case. In the mean time, Bishay trusts that a single

apparent forgery unearthed thus far is sufficient to annul the subject awards – particularly in light

of the more than $5.0 million in question.

**10. BAA alleges that service of process was insufficient.** Again, Bishay will not take

up this Court's time to address this silly argument because it is obvious that BAA's counsel did

not refuse or otherwise returned the Application-Complaint upon receipt. Bishay is certain that

had he served the package on BAA's owners, it would have ended up with BAA's counsel

within less than a few hours. Thus, this argument should not even have been made, as it is nothing but an insult to this Court's intelligence and legal acumen.

11. **BAA finally alleges that if this Court vacated the subject awards it should not grant a bench or jury trial to resolve the parties' contract dispute, but to somehow remand the matter to AAA.** While Bishay does not believe it is unreasonable to have asked this Court to grant a bench or jury trial to resolve the subject contract dispute, considering the bogus results experienced by Bishay to date in connection with the services provided by AAA, Bishay would be pleased to participate in another arbitration proceeding, but certainly not administered by AAA -- should this Court now sees fit to designate another arbitration entity or individuals instead of a bench or jury trial sought by Bishay.

WHEREFORE, for all the reasons set forth above as well as the Application-Complaint filed with this Court, Bishay respectfully requests this Court to <u>deny</u> BAA's Motion to Dismiss; and grant any other relief this Court deems just based on the foregoing circumstances.

Respectfully submitted

Bahig F. Bishay,
Pro se

Dated this 2 May of October 19, 2005

Bahig F. Bishay
163 Blue Hill Drive
Westwood, MA 02090
Phone: 781.326.3310
Fax: 781.326.6690

7

## CERTIFICATE OF SERVICE

I hereby certify that I served true and accurate copy of this document on all counsels of record, by First Class Mail, pre-paid postage, this day 2nd October, 2005.

Bahig Bishay

# EXHIBIT-1



Build hope by building homes. 

The Boston Globe                                                      boston.com

# Search

**WEDNESDAY, NOVEMBER 14, 2001**

The article you requested is displayed below. [ Search again ]

## LANDLORD PLEADS GUILTY TO PAYING $1,000 BRIBE TO A BOSTON OFFICIAL

**Author(s):** William F. Doherty, Globe Staff
**Date:** May 3, 1986 **Page:** 18 **Section:** METRO

Describing himself as the victim of corrupt city officials, **Harold Brown**, Boston biggest residential landlord, pleaded guilty yesterday in US District Court to a charge that he paid a $1,000 bribe to a city official.

He also disclosed that he plans to plea guilty to another charge, yet to be filed in state court, that he made an illegal cash campaign contribution to City Councilor Brian J. McLaughlin (Allston-Brighton.) The guilty plea by Brown yesterday was part of a plea bargain in which US Attorney William F. Weld's office agreed to drop three perjury charges and not to recommend a prison sentence.

US District Judge Rya W. Zobel said she would sentence Brown on June 12. He faces up to 10 years in prison and a $250,000 fine.

Brown admitted giving former chief plans examiner Paul Folkins a $1,000 cash payment at a meeting that Folkins tape-recorded in April 1985.

Brown is one of 15 persons charged in the last nine months by federal investigators probing the city's Inspectional Services Department.

In a prepared statement, Brown said "Many real estate developers and property owners, as well as I, were victimized by a corrupt system at the Inspectional Service Department, which forced us either to pay or to suffer unnecessary and expensive delays and other

### Sections

PAGE ONE
NATION | WORLD
CITY | REGION
BUSINESS
SPORTS
LIVING | ARTS
EDITORIALS | OP-ED

### RELATED FEATURES

Obituaries
Death notices
Globe archives
Web reprints
Buy Globe photos

**ASSISTANCE**
Questions
Search help
Search fees
Account info
Help and feedback
Copyright information
Search NY Times
Search other papers

obstacles that prevented us from obtaining licenses and
permits to which we were entitled."

But Brown said Weld's prosecution of corruption in the
city "has produced a healthier, more honest and more
professional atmosphere at City Hall."

He said he was "delighted" that his own case, among
others, contributed to producing "a healthier atmosphere
at City Hall."

The perjury charges that Weld's office dismissed
included allegations that Brown lied to a grand jury
when he denied making the payment to Folkins and
denied making two other cash payments totaling $2,500
to McLaughlin.

Assistant US Attorney Robert J. Cordy, who has been
deputized as a special state attorney general to file the
illegal campaign contribution charge against Brown, said
he would recommend a suspended sentence on that
charge. Cordy said McLaughlin would not be charged.

According to the indictment, the $1,000 bribe Brown
paid Folkins was in connection with a building-permit
application that undestimated the value of a 64-unit
residential complex Brown was building on North
Beacon Street in Brighton.

Cordy said yesterday that after Folkins and Brown
agreed on a $2.5 millon value for the development and a
$24,000 fee for the building permit, Brown handed
Folkins the $1,000 and said "I hope this will be the start
of a good working relationship."

"Folkins further advised that any monies he had been
offered by or had received from Brown had come
through a city official of higher rank than himself,"
according to the document.

But one of Brown's lawyers, Harvey A. Silverglate, said
Folkins was not credible.

Folkins was indicted two weeks ago on racketeering
charges. He allegedly accepted bribes during a two-year
period, when he was apparently cooperating with
authorities.

The guilty plea means the April 29, 1985, tape-recorded
conversation in which, court documents show, Brown

discussed "his dealings with other corrupt city officials some of whom he named," will not be played in court.

The fact that none of the other six developers convicted in the probe receivied prison sentences was a factor in his decision to plead guilty, Brown said.

Silverglate said the $1,000 payment Brown made to Folkins was not a bribe but a "gratuity" to prevent future harassment.

Brown, by his own estimate owns 10,000 apartments and is a general partner in about 80 real-estate development ventures in Greater Boston. He has estimated the market value of his holdings at between $500 million and $1 billion.

**Techical problems**: If you have a technical problem with your account please contact Newsbank at 1-800-896-5587 or by e-mail at newslibrary@newsbank.com.

Return to the home page
of The Boston Globe Online

© Copyright 2001 Globe Newspaper Company





The Boston Globe                                          boston.com

ASSISTANCE
Questions
Search help
Search fees
Account info
Help and
feedback
Copyright
information
Search NY
Times
Search other
papers

# Search

WEDNESDAY, NOVEMBER 14, 2001

The article you requested is displayed below. [ Search again ]

## LANDLORD TO PLEAD GUILTY IN BRIBE CASE

**Author(s):**   Ed Quill, Globe Staff **Date:** May 2, 1986 **Page:** 17 **Section:** METRO

Sections
PAGE ONE
NATION§WORLD
CITY§REGION
BUSINESS
SPORTS
LIVING§ARTS
EDITORIALS § OP-ED

RELATED FEATURES
Obituaries
Death notices
Globe archives
Web reprints
Buy Globe photos

After several months of plea bargaining, **Harold Brown**, Boston's biggest residential landlord, is scheduled to plead guilty today to paying a bribe to a city official for favorable treatment on a construction project.

As a result of an agreement reached yesterday between Brown and US Attorney William F. Weld's office, Brown may have avoided a prison sentence in the case, legal and federal sources said. According to an indictment returned last September by a secret grand jury that has been investigating the city's Inspectional Services Department, Brown had allegedly paid former chief plans examiner Paul Folkins a $1,000 bribe in April 1985 in a meeting tape-recorded by Folkins.

The purpose of the payment, federal officials charged, was to gain approval of a building permit for construction of a $2.5 million, 64-unit residential complex on North Beacon Street in Brighton.

Brown will plead guilty to one count of bribery in the Folkins case, under the agreement reached with Weld's office, according to Harvey Silverglate, Brown's attorney.

In return, the government will dismiss a perjury charge in the bribery incident and will also drop two other perjury charges involving two separate payments totaling $2,500 that Brown allegedly made to District City Councilor Brian J. McLaughlin (Allston-Brighton).

McLaughlin later turned the money over to FBI agents and cooperated in the investigation, federal officials said.

Brown's change of plea could allow McLaughlin to remain silent on why he allegedly accepted $1,000 in cash from Brown in October 1984 and another $1,500 in cash in February 1985, but failed to turn the money over to authorities until after the second payment. McLaughlin had said earlier that he would explain when he testified at the trial.

McLaughlin yesterday refused until after the Brown case is completed in court, to answer several questions on his role in the matter. He would not discusswhy he had accepted the cash from Brown, why he held some of the money for several months before alerting authorities, why he failed to report the original $1,000 payment on his 1984 income tax form, or whether he asked the US Attorney's office to withhold announcement of the indictment of Brown until after last year's election.

The indictment in September and a separate indictment last November had charged that Brown had lied when he told the grand jury in April 1985 that he had never paid city officials money.

Assistant US Attorney Robert Cordy confirmed yesterday that the plea bargaining agreement had been reached and that Brown is scheduled to enter the new plea before US Judge Rya Zobel today at 4 p.m.

Cordy refused to discuss the reasoning for the government's decision to enter into an agreement to drop the perjury charges and make no recommendation on an appropriate penalty for the bribery when Brown is scheduled to be sentenced by Zobel in three weeks.

But City Hall sources said federal prosecutors had a problem with the case against Brown when Folkins, their key witness, was himself indicted two weeks ago for allegedly accepting bribes during a two-year period when he was apparently cooperating with the authorities. Folkins has pleaded innocent to the charge of racketeering in a pattern of accepting bribes from December 1983 to last July.

In addition, several other developers who were indicted in the three-year investigation for paying bribes to building inspectors or lying to the grand jury have received fines and suspended sentences, but none have

been sentenced to prison.

Sources said it was unlikely that Brown would have been made an exception and sent to jail, even if he had been convicted in a jury trial that had been scheduled to begin next week.

Silverglate said: "The government had some problems and we had some problems with our case, too, and that's what compromises are made of. You can guess what their problem was. We knew from our own investigation what Folkins was doing. So when both sides have some risk, that's when deals are made."

Cordy was recently appointed a special assistant attorney general for Massachusetts with authority to investigate the payments allegedly made by Brown to McLaughlin as a possible violation of the campaign finance law.

If anyone is ever charged on that count, it would be a misdemeanor charge, Cordy said yesterday.

**Techical problems**: If you have a technical problem with your account please contact Newsbank at 1-800-896-5587 or by e-mail at newslibrary@newsbank.com.

Return to the home page
of The Boston Globe Online

© Copyright 2001 Globe Newspaper Company

Boston Globe Online / Archives



## Build hope by building homes.

The Boston Globe                                    boston.com

ASSISTANCE
Questions
Search help
Search fees
Account info
Help and
feedback
Copyright
information
Search NY
Times
Search other
papers

# Search

**WEDNESDAY, NOVEMBER 14, 2001**

The article you requested is displayed below. [ Search again ]

## DEVELOPER MADE A 3D CASH PAYMENT TO MCLAUGHLIN, CITY HALL SOURCES SAY

**Author(s):**   Michael K. Frisby, Globe Staff **Date:** January 8, 1986 **Page:** 21 **Section:** METRO

## Sections

PAGE ONE
NATION | WORLD
CITY | REGION
BUSINESS
SPORTS
LIVING | ARTS
EDITORIALS | OP-ED

Developer **Harold Brown** allegedly made a third cash payment of at least $1,000 to District City Councilor Brian McLaughlin (Allston-Brighton), which thus far has not been disclosed by federal authorities, Boston City Hall sources said yesterday.

RELATED FEATURES
Obituaries
Death notices
Globe archives
Web reprints
Buy Globe photos

Two months ago, Brown was indicted on perjury charges for allegedly lying to a federal grand jury regarding two cash payments totalling $2,500 allegedly made to McLaughlin in October 1984 and February 1985. McLaughlin has acknowledged receiving the $2,500 and, after the second payment, turned the money over to the FBI. He has assisted federal authorities with their investigation and has not been charged with any crime in connection with the payments.

Yesterday, sources said McLaughlin - in assisting the federal investigation - wore "a wire" or listening device to secretly record conversations with Brown when he allegedly received the third cash payment of at least $1,000 from Brown.

According to sources, the third payment was made sometime earlier this year, but after Brown had appeared before a federal grand jury and testified under oath that he had never given cash to a city employee or elected official.

According to the indictment, Brown, a multimillionaire and the city's largest residential landlord, also testified he

could not assist in the grand jury investigation of corruption in Boston because he had no firsthand knowledge of any corruption.third payment because it took place after Brown testified before the federal grand jury.

Sources said, however, that the information gathered during the federal investigation may be turned over to state authorities for possible prosecution on state charges, which could include bribery or extortion.

Neither Weld nor McLaughlin would comment yesterday and attorney Harvey Silverglate, who represents Brown, also declined comment.

Before he was charged with perjury in connection with the alleged McLaughlin payments, Brown had been indicted for allegedly paying a $1,000 bribe to Paul Folkins, a former Inspectional Services Department employee, and then allegedly lying about it to the grand jury.

The money paid to Folkins allegedly was for Folkins' approval of a building permit application that underestimated the cost of a residential complex Brown was building on North Beacon Street in Brighton.

McLaughlin, however, has stated Brown never said what he wanted in return for the cash payments allegedly made to him.

The district councilor has been under fire from Allston-Brighton residents for not explaining why he waited until February before turning the money over to the FBI. He has said the public will learn the details at the trial.

Yesterday, sources said Suffolk County District Attorney Newman Flanagan was asked in a letter from four Brighton residents to investigate McLaughlin's role in the alleged payoffs.

Sources said Flanagan has conferred with US authorities, but has decided not to intervene because they are handling the case.

**Techical problems**: If you have a technical problem with your account please contact Newsbank at 1-800-896-5587 or by e-mail at newslibrary@newsbank.com.

Boston Globe Online / Archives

Return to the home page
of The Boston Globe Online

© Copyright 2001 Globe Newspaper Company



**IT'S NEVER FELT BETTER TO GIVE**    United Way

The Boston Globe                          boston.com

# Search

WEDNESDAY, NOVEMBER 14, 2001

**ASSISTANCE**
Questions
Search help
Search fees
Account info
Help and
feedback
Copyright
information
Search NY
Times
Search other
papers

## Sections

**PAGE ONE**
**NATION|WORLD**
**CITY|REGION**
**BUSINESS**
**SPORTS**
**LIVING|ARTS**
**EDITORIALS | OP-ED**

**RELATED FEATURES**
Obituaries
Death notices
Globe archives
Web reprints
Buy Globe photos

The article you requested is displayed below. [ Search again ]

## BOSTON LANDLORD IS FINED $25,000

**Author(s):**    William F. Doherty, Globe Staff
**Date:** June 18, 1986 **Page:** 21 **Section:** METRO

**Harold Brown**, the multimillionaire Boston landlord, was fined $25,000 and received a one-year suspended sentence yesterday for attempting to bribe a city official.

The city's largest residential property owner pleaded guilty last month to making a $1,000 cash payment to obtain a building permit. US District Judge Rya W. Zobel said it would not be "appropriate or fair" to impose a prison sentence on Brown when the other six developers convicted earlier in the same investigation of the city Inspectional Services Department did not receive prison sentences.

The guilty plea was part of a plea bargain in which US Attorney William F. Weld's office agreed to drop three perjury charges and not to recommend a prison sentence.

Zobel required Brown to perform 150 hours of community service. Brown said he would like to teach underprivileged children baseball and tennis.

The bribery charge carried a penalty of up to 10 years in prison and a $250,000 fine.

Brown, 61, who lives on Commonwealth Avenue in Allston, controls a Boston real estate empire valued at between $500 million and $1 billion.

He and his company, Hamilton Realty, own at least 10,000 apartments and four million square feet of commerical space. He once owned 40 percent of all

apartments in the Brighton and Allston area.

His personal net worth in 1984 was estimated at $200 million.

Brown is one of 16 persons charged in the last 10 months by federal investigators probing the Inspectional Services Department.

In a statement to the judge, Brown depicted himself as the victim of corrupt city officials. He said there had been a "vast improvement" in the operation of the Inspectional Services Department as the result of Weld's investigation.

He said he had learned from his case: "Don't pay to expedite a building permit. Let the building wait."

Brown admitted giving former chief plans examiner Paul M. Folkins a $1,000 bribe at a meeting that Folkins tape-recorded in April 1985.

The perjury charges that Weld's office dismissed included allegations that Brown lied to a grand jury when he denied making the payment to Folkins and denied making two other cash payments totaling $2,500 to City Councilor Brian J. McLaughlin (Brighton-Allston).

Brown has agreed to plead guilty to a state misdemeanor charge, yet to be filed, that he gave an illegal campaign contribution to McLaughlin.

According to the indictment, the $1,000 bribe Brown paid Folkins was in connection with a building permit application that underestimated the value of a 64-unit townhouse complex on North Beacon Street in Brighton.

Brown's lawyer, Harvey Silverglate, said that the payment was made to expedite issuance of the building permit, not to obtain an undervalued permit.

Assistant US Attorney Robert J. Cordy said earlier that after Folkins and Brown agreed on a $2.5 million value for the development and a $24,000 fee for the building permit, Brown handed Folkins the $1,000 and said, "I hope this will be the start of a good working relationship."

According to court documents, Folkins told investigators that he had seen Brown make cash payments to other city employees "including a former commissioner of the Inspectional Services Department."

Asked yesterday if he had paid bribes to other city officials, Brown said: "I don't think I am at liberty to answer that question."

Cordy said a decision has not been made on whether to call Brown back before the grand jury.

The prosecution's case against Brown suffered a blow earlier this year when its chief witness, Folkins, admitted he accepted bribes during a two-year period that he was cooperating with authorities. He pleaded guilty to racketeering charges and is awaiting sentencing.

A petition supporting Brown, signed by 286 persons who live or work in the Back Bay, including some of his tenants, was filed with the court. Sixty-eight of the signers said Brown's character was "beyond reproach." Another 218 described his character was "fair and reasonable."

Allston-Brighton tenant activist Nancy Grilk said the sentence was too lenient. "He'll just raise the rents," she said.

**Techical problems**: If you have a technical problem with your account please contact Newsbank at 1-800-896-5587 or by e-mail at newslibrary@newsbank.com.

Return to the home page
of The Boston Globe Online

© Copyright 2001 Globe Newspaper Company

**IT'S NEVER FELT BETTER TO GIVE**    United Way

The Boston Globe    boston.com

ASSISTANCE
Questions
Search help
Search fees
Account info
Help and
feedback
Copyright
information
Search NY
Times
Search other
papers

# Search

**WEDNESDAY, NOVEMBER 14, 2001**

The article you requested is displayed below. [ Search again ]

## FINNERTY SAYS BROWN LIED ABOUT STATE ST.

> **Author(s):**  Frank Phillips and Brian C. Mooney,
> Globe Staff **Date:** February 10, 1989 **Page:** 1
> **Section:** METRO

**Sections**
PAGE ONE
NATION | WORLD
CITY | REGION
BUSINESS
SPORTS
LIVING | ARTS
EDITORIALS | OP-ED

In his first public statement on the issue, Thomas Finnerty, the Boston attorney who has been implicated in an alleged extortion scheme by developer **Harold Brown**, said yesterday that Brown offered him a partnership interest in the 75 State Street project to gain respectability.

RELATED FEATURES
Obituaries
Death notices
Globe archives
Web reprints
Buy Globe photos

Finnerty, appearing last night on WCVB-TV (Ch. 5) to rebut a station editorial, also lashed out at Brown and called the controversial landlord a liar. Brown's attorney, in a brief statement, said Finnerty's attack is part of a "public relations campaign . . . seeking to attack Mr. Brown's integrity and credibility in order to attempt to influence the outcome of the recently announced review of the federal investigation into the 75 State Street matter."

The Boston Globe reported yesterday that interim US Attorney Jeremiah O'Sullivan this week asked the FBI to revive the investigation.

On Wednesday, agents reportedly interviewed attorney Michael M. Davis, who has represented Graham Gund, the architect on 75 State Street and Brown's original partner.

Law enforcement sources have said that the 2 1/2-year federal probe into Brown's allegations that Finnerty extorted $500,000 from him floundered when Gund contradicted Brown's claims. Neither Davis nor Gund returned calls from the Globe. O'Sullivan's office

declined comment.

Finnerty, a close associate of Senate President William
Bulger, said Brown's decision to approach him to join
the development was an effort to overcome what the
lawyer said is Brown's "terrible reputation."

"He knew his terrible reputation would disqualify him as
the developer of 75 State Street," Finnerty said, in a 60-
second taped reply to the station's editorial that called on
Massachusetts Attorney General James Shannon to
investigate the influence peddling charges by Brown.

"He assured me rumors of his illegal activities were
false. Brown offered me a partnership interest if, as a
former district attorney and prosecutor, I would put my
reputation and integrity on the line and strive to assure
his proposal would receive fair consideration," Finnerty
said.

Brown charged in a civil suit that Finnerty, using
Bulger's name, extorted a $500,000 payment from him
in 1985 as part of an influence peddling scheme.
Finnerty sued Brown, accusing him of reneging on
additional payments of up to $1.3 million that Finnerty
said was due him under a 1983 contract with the
developer.

On Dec. 29, Brown suddenly agreed to settle the dispute
out of court by paying Finnerty an additional $200,000
over five years. Bulger was drawn into the controversy
when Brown's lawyers discovered that Finnerty had paid
$240,000 of the Brown funds to Bulger shortly after
receiving the money.

Bulger, in an affidavit filed Dec. 19, said the payment
was a loan that he quickly repaid with interest upon
learning that Brown, who was then under indictment for
perjury and bribery, was "the remote source" of the
money.

In his statement yesterday, Finnerty said his decision to
become a limited partner, with an equity interest in the
$286 million project, was "a serious mistake because
Mr. Brown lied to me just as he later lied to the grand
jury.

"When he breached his written agreement, I sued and
Mr. Brown did what he does best -- he lied -- this time

claiming the agreement was illegal," he said. Finnerty said that Brown later was twice indicted for perjury and admitted to bribing public officials.

"If I had extorted money from **Harold Brown**, would I then have sued him in a court of law? Would **Harold Brown** have paid me an additional $200,000 to settle a case in which he claimed I had already extorted $500,000? That's nonsense," Finnerty said.

The Boston attorney also accused both Channel 5 and the Globe, which first reported on Brown's accusation in December, of being "accessories" to Mr. Brown's false accusations.

"The Federal Communications Commission should investigate why," he said concluding his remarks. The FCC regulates television stations, but has no authority to investigate or oversee the operations of newspapers.

Brown's lawyer, Harvey A. Silverglate, said yesterday that his client "will make no statement about the 75 State Street matter" because a review of the original investigation is under way.

But Silverglate said Finnerty's attack was part of an escalating public relations offensive against Brown. "Anti-Brown stuff is coming in, under and over transoms all over the city," he said in a telephone interview.

Earlier this week, Brown's lawyers issued a statement in which he backed off previous statements filed in court that former Attorney General Edward J. McCormack personally approached him in 1983 seeking a 30 percent share of the State Street development. Brown said his information was only based on heresay but he did not say who told him of the alleged overture by McCormack.

The former attorney general, who represented Finnerty in later dealings with Brown over the State Street project, has denied that he ever solicited an equity interest in the project, and has threatened to sue Brown if he made the charges publicly, outside the protection of court filings, which are privileged.

**Techical problems**: If you have a technical problem with your account please contact Newsbank at 1-800-896-5587 or by e-mail at newslibrary@newsbank.com.

Boston Globe Online / Archives

Return to the home page
of The Boston Globe Online

© Copyright 2001 Globe Newspaper Company

# EXHIBIT-2

9/30/04 Argued n̄
COMMONWEALTH OF MASSACHUSETTS *open of*

SUFFOLK, SS.                          SUPERIOR COURT DEPARTMENT
                                     C.A. NO. 01-3943

12/30/04 Denied.

BAHIG BISHAY,
                    Plaintiff,          ) See my written opinion
                                        ) issued this date
vs.                                     )
                                        )
BRIGHTON AVENUE ASSOCIATES,             )
LLC, HAROLD BROWN, and                  )
THE HAMILTON COMPANY, INC.              )
                    Defendants.         )
                                        )

_____                   JUSTICE

## DEFENDANT BRIGHTON AVENUE ASSOCIATES, LLC'S
## MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON THE
## DEFENDANT'S COUNTERCLAIMS

The Defendant Brighton Avenue Associates, LLC ("BAA") hereby moves this

Honorable Court, pursuant to Mass. R. Civ. P. 50(b), for entry of judgment

notwithstanding the verdict on BAA's counterclaims. As grounds for its Motion, BAA

states that: (a) the jury's failure to find in favor of BAA on its counterclaims is contrary

to the legally sufficient evidence; and (b) there is no evidence that BAA waived its right

to claim these damages.

For these reasons, and for the additional reasons set forth in the accompanying

memorandum, BAA respectfully requests that the Court enter judgment notwithstanding

the verdict on BAA's counterclaims.

notice sent 1/3/05   (all parties)

9/30/04 Argued in open Ct
90-1 /26

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                          SUPERIOR COURT DEPARTMENT
                                     C.A. NO. 01-3943

)
BAHIG BISHAY,                        )    12/30/04 Denied. See
              Plaintiff,             )
                                     )    written opinion issued
vs.                                  )    this date.
                                     )
BRIGHTON AVENUE ASSOCIATES,          )
LLC, HAROLD BROWN, and               )
THE HAMILTON COMPANY, INC.           )                    Justice
              Defendants.            )

## DEFENDANT BRIGHTON AVENUE ASSOCIATES, LLC'S
## MOTION FOR REMITTITUR

The Defendant Brighton Avenue Associates, LLC ("BAA")[1] hereby moves this

Honorable Court for remittitur of the damages awarded by the jury on the Plaintiff's

breach of contract claim if the Court does not enter judgment notwithstanding the verdict

on the Plaintiff's breach of contract claim. As grounds for it Motion, BAA states that the

damages awarded: (a) are based upon evidence that should have been excluded under the

Best Evidence Rule; (b) are excessive and duplicative; (c) fail to account for proper

setoffs; and, (d) award the Plaintiff amounts for which he has not and will not ever

become liable to pay. As such, the damages awarded constitute a windfall to the

Plaintiff, which, if not remitted, will result in a miscarriage of justice.

For these reasons, and for the additional reasons set forth in the accompanying

Memorandum, BAA respectfully requests that if the Court does not enter judgment

notwithstanding the verdict on the Plaintiff's breach of contract claim, the Court order

---

[1] This motion is made by BAA only because, as determined by the jury in its verdict, Defendants Harold
Brown and The Hamilton Company, Inc., were not liable to the Plaintiff on the claims asserted.

notice sent 1/3/05    (all parties)

*9/36/04 Argued in open ct /BB*
*28*

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
C.A. NO. 01-3941

| | |
|---|---|
| BAHIG BISHAY, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| BRIGHTON AVENUE ASSOCIATES, | ) |
| LLC, HAROLD BROWN, and | ) |
| THE HAMILTON COMPANY, INC. | ) |
| Defendants. | ) |

*12/30/04 Denied*
*See my written opinion*
*issued this date*
*Justice*

### DEFENDANT BRIGHTON AVENUE ASSOCIATES, LLC'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON THE PLAINTIFF'S BREACH OF CONTRACT CLAIM

The Defendant Brighton Avenue Associates, LLC ("BAA")[1] hereby moves this

Honorable Court, pursuant to Mass. R. Civ. P. 50(b), for entry of judgment

notwithstanding the verdict on the Plaintiff's breach of contract claim. As grounds for its

motion, BAA states that: (a) the contract concerns an interest in land, however, there is

no evidence of a memorandum sufficient to satisfy the Statute of Frauds; (b) as a matter

of law, Bishay is not entitled to recover on a breach of contract claim based upon a

reliance where, as here, the jury found against Bishay on his tort claims, also based upon

reliance; and (c) the evidence is insufficient to support a finding that an oral contract

existed.

---

[1] This motion is made by BAA only because, as determined by the jury in its verdict, Defendants Harold Brown and The Hamilton Company, Inc., were not liable to the Plaintiff on the claims asserted.

notice sent 1/3/05    (all parties)

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court**

CIVIL DOCKET# **SUCV2001-03943**

Bishay
vs.
Brighton Avenue Associates, LLC et al

## JUDGMENT ON JURY VERDICT

This action came on for trial before the Court and a jury, John C. Cratsley, Justice, presiding, the issues having been duly tried and the jury having rendered its verdict,

It is **ORDERED and ADJUDGED:**

That the plaintiff, **Bahig Bishay** recover of the defendant, **Brighton Avenue Associates, LLC,** the sum of **One Million, One Hundred and Seventy Five Thousand Dollars ($1,175,000.00),** with interest thereon, as provided by law, and his costs of action.

All claims of the plaintiff against defendants The Hamilton Company, Inc. and Harold Brown are dismissed.

That the defendants take nothing on their counterclaims, and that each of the counterclaims asserted in this action be dismissed on the merits.

Dated at Boston, Massachusetts this 4th day of February, 2005.

BY:........................................................
Assistant Clerk

JUDGMENT ENTERED ON DOCKET ____2 - 4 - 20 05
PURSUANT TO THE PROVISIONS OF MASS. R. CIV. P. 58(a)
AND NOTICE SENT TO PARTIES PURSUANT TO THE PRO-
VISIONS OF MASS. R. CIV. P. 77(d) AS FOLLOWS .

TRUE COPY OF JUDGMENT DULY ENTERED ON ___2 - 4 - 2005

cvdjudverp_1.wpd 2025221 trksel quinnela

*incopy.*

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

**SUPERIOR COURT**
**CIVIL ACTION NO. 01-3943**

### BAHIG BISHAY

#### vs.

### BRIGHTON AVENUE ASSOCIATES, LLC & others[1]

### MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON PLAINTIFF'S BREACH OF CONTRACT CLAIM AND DEFENDANTS' COUNTERCLAIMS AND MOTION FOR REMITTITUR

notice sent
1/3/05
J.F.C.
C.S.S.
H S
J.S.S.
J.D.F.
R F

(mm)

The plaintiff, Bahig Bishay ("Bishay"), brought this breach of contract claim to recover

damages he incurred arising out of an agreement he maintains he made in which one or more of

the defendants, Brighton Avenue Associates, LLC ("BAA"), Harold Brown ("Brown"), and the

Hamilton Company, Inc. (collectively "the defendants"), granted Bishay permission to continue

to occupy premises owned by BAA. The defendants counterclaimed, alleging that Bishay owed

BAA rent for use and occupancy, as well as damages under the parties' lease agreement. The

principal issue contested at trial was whether the parties had formed a binding contract allowing

Bishay to remain in a commercial premises for an additional thirty days. After a lengthy trial,

the jury returned a verdict for Bishay and against one defendant, BAA, on Bishay's breach of

contract claim and awarded him $1,175,000.00 in damages. The jury also rejected the

defendants' counterclaims for use and occupancy, liquidated damages, and expenses (under the

"indemnity provision"). Now before this Court is the defendants' motion for judgment

notwithstanding the verdict ("JNOV") on both the Bishay's claims and the defendants'

counterclaims. For the reasons set forth below, the defendants' motions are *DENIED*.

---

[1] Harold Brown and The Hamilton Company, Inc.

I.    **The Appropriate Legal Standard**

A motion for JNOV pursuant to Mass. R. Civ. P. 50(b) addresses the same issues as those presented to the Court on a motion for directed verdict. *Birbiglia* v. *Saint Vincent Hospital, Inc.*, 427 Mass. 80, 83 (1998). A motion for JNOV is limited to situations where the Court denies a motion for directed verdict made at the close of all the evidence. *Sqibb* v. *R.M. Bradley & Co., Inc.*, 40 Mass. App. Ct. 914, 915 (1996). The failure to move for a directed verdict at the close of all the evidence results in a waiver of not only the right to move for JNOV, but also the right to request appellate review of an order denying JNOV. *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 9 (1983). In addition, a ground not raised in a directed verdict motion cannot be raised in a motion for JNOV. *Deerskin Trading Post* v. *Spencer Press*, 398 Mass. 118, 125 (1986).

Bishay correctly argues that by failing to move for directed verdict at the close of all the evidence, BAA waived its right to move for JNOV.[2] Indeed, Rule 50(b) and the available precedent instruct that the requirement of moving for a directed verdict at the close of all the evidence is a strict prerequisite to filing a motion for JNOV. See *Hatton* v. *Meade*, 23 Mass. App. Ct. 356, 361-362 (1987). Given the fact that the defendants' motion for JNOV on Bishay's breach of contract claim is denied herein, as well as given the novel issues in this case, I will proceed to address the substantive issues presented.

With respect to the defendants' counterclaims, failure to move for directed verdict at the close of all the evidence limits this Court's review of the verdict. Despite the defendants'

---

[2] A review of the electronic docket entries in this case confirms that the defendants did not move for directed verdict at the close of all the evidence on either Bishay's breach of contract claim or their counterclaim.

2

failure to move for a directed verdict on the grounds now asserted in the motion for JNOV, a "new trial may be granted where [the] jury's verdict is wholly without legal support . . . in order to prevent a manifest injustice." *Szalla* v. *Locke*, 37 Mass. App. Ct. 346, 350 (1994), quoting *Hatton*, 23 Mass. App. Ct. at 362 (additional citations omitted). See also *Michnik-Zilberman*, 390 Mass. at 9. As discussed below, this Court is not persuaded, in light of all of the evidence submitted during the trial, that the jury verdict with respect to the defendants' counterclaims is wholly without legal support.

Conflicting evidence alone does not compel this Court to set aside the jury's verdict. Moreover, this Court may not substitute its judgment of the facts for that of the jury. *O'Shaughnessy* v. *Besse*, 7 Mass. App. Ct. 727, 728 (1979). In considering BAA's motion for JNOV, the Court must take into consideration all of the evidence in the light most favorable to the prevailing party to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury could reasonably return a verdict for that party. *Cambridgeport Sav. Bank* v. *Boersner*, 413 Mass. 432, 438 (1992) (additional citations omitted). Moreover, this Court must consider whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn" in favor of Bishay, the prevailing party. *Id.* "The inferences to be drawn must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture." *Id.*, quoting *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 706-707 n.3 (1990) (additional citations omitted).

This Court should set aside the jury's answers to special questions and enter judgment for the opposing party only if the answers cannot stand as a matter of law. See *Thompson* v. *Auto Credit Rehab. Corp.*, 56 Mass. App. Ct. 1, 6-7 (2002) (setting aside special verdict that directly

3

conflicted with statute at issue).

## II.    The Trial

The following evidence was introduced during the trial:

On January 12, 2001, Bishay and BAA entered into a Purchase and Sales Agreement ("P & S") whereby Bishay, through 1095 Commonwealth Avenue Trust, sold 1095 Commonwealth Avenue, Boston, MA ("the premises"), to BAA for a purchase price of $9,380,000.00. Ex.1. Bishay sold the premises in order to raise funds for his automobile dealership franchises, and the parties contemplated developing the premises as a joint venture.

The P & S contained a lease provision establishing a tenancy relationship between BAA and Bishay. Ex. 1. Bishay leased the premises from BAA for a term of six years. The first year's rent was to equal $600,000.00 and to decrease in the remaining five years to $200,000.00 annually. Ex. 1. The terms of the P & S also entitled Bishay to earn up to twenty-five percent equity interest in BAA according to a formula set forth in the P & S. The parties intended to use their best efforts to find a third party to lease the premises, and Bishay's potential earned equity would be partially determined by the amount of rent taken in by BAA from the third party tenant. Ex. 1. Bishay's earned equity would accrue if BAA entered into a satisfactory lease with a qualified third party tenant before December 1, 2001. Ex. 1.

Bishay thereafter paid BAA $50,000.00 rent per month for January, February, and March of 2001. Following a dispute over real estate taxes, Bishay did not pay his rent for April and May of 2001. BAA subsequently served Bishay with a Notice to Quit for Nonpayment of Rent on March 27, 2001. Bishay contacted Brown to negotiate the arrearage, but the parties were unable to reach a consensus. Ex. 57. On April 2, 2001, Bishay received a second notice to quit. Ex. 49. BAA then commenced a summary process action against Bishay in Brighton District

4

Court. Ex. 3.

In settling the summary process action, the parties entered into a Judgment by Agreement. Ex. 4. According to the terms of the handwritten agreement, judgment entered in favor of BAA and against Bishay for damages in the amount of $120,874.10. Ex. 4. In addition, BAA relinquished its right to levy on the execution for possession until July 31, 2001, in exchange for a $50,000.00 payment toward the judgment from Bishay. Ex. 4. Upon receipt by BAA of the payment on or before June 29, 2001, Bishay was entitled to remain on the premises until July 31, 2001. Ex. 4. The agreement also clearly states that the $50,000.00 payment constituted partial satisfaction of the judgment and did not create a new tenancy. Ex. 4. In the summary process complaint, BAA claimed Bishay owed it damages under the late fee provision of the lease. The agreement withdrew BAA's claim for late fees, but stated that this withdrawal did not constitute a waiver. Ex. 4. The agreement also stated that the agreement settled the summary process action only. On May 30, 2001, the Brighton District Court issued BAA a writ of execution for money judgment and possession of the premises. Ex. 30. The writ incorporated the parties' Judgment by Agreement.

Bishay did tender the $50,000.00 payment and remained in possession of the premises throughout July of 2001. Ex. 6. During June and July of 2001 the parties attempted to find a viable third party tenant for the premises. One potential tenant was Gallery Automotive Group, Inc. ("Gallery"), an automobile dealership. Ex. 10, 11, 32, 50, 52. To establish a tenancy with Gallery, Bishay would be required to transfer valuable dealer licenses registered to the premises to Gallery. Ex. 50. Bishay testified that he was especially concerned that he would lose the valuable licenses if he did not maintain a commercial presence on the premises. Bishay testified that his loss of the license would extinguish the possibility of a tenancy agreement with Gallery.

5

Throughout the negotiations, Bishay was acutely aware that obtaining a third party tenant was necessary for him to earn equity in BAA.

On August 1, 2001, Brown and Bishay met with David Spiegel, Gallery's representative in the Boston area, to discuss Gallery's potential lease of the premises. Brown testified that he believed Gallery had not made any definite commitment to lease the premises. Consequently, Brown was actively pursuing a lease arrangement with Ming's Asian Market ("Ming's"). At the time of the Gallery meeting, however, Bishay did not see any written confirmation of a lease arrangement between BAA and Ming's. Bishay testified that he was aware of Brown's negotiations with Ming's, but he nevertheless thought that Gallery was still a viable tenant. Bishay testified that even after the Gallery meeting he continued to believe that preserving the dealer licenses was critical to the success of negotiations with Gallery. Ex. 51.

Bishay testified that after the Gallery meeting he informed Brown that he had rented a storage space in Norwood to which he was moving his property. Bishay testified that he told Brown he would pay $10,000.00 for limited use of the premises, and that the parties reached an extension agreement the night of the Gallery meeting. On July 31, 2001, Brown and Bishay went to lunch and further discussed the terms of the extension. At the lunch Brown wrote a shorthand note of the terms of the agreement, to which Bishay made some small revisions. Ex. 11. The note, dated August 1, 2001, represents that Bishay would be allowed to retain fourteen antique cars, three lifts, three bikes, and one inspection machine on the premises. He would also be allowed limited access to the second floor of the premises, and some parking spots in the outdoor lot. The note also states that Bishay would pay $10,000.00; $5,000.00 for the second floor occupancy and $5,000.00 for storing the equipment. The note does not include any term regarding the duration of the occupancy. Bishay testified that he ceased moving his equipment

6

to the Norwood facility because he believed that he and Brown had reached an agreement for an extension.

Following lunch, Brown and Bishay went to Brown's office where they dictated the terms of the agreement to The Hamilton Company's paralegal, Mary McCarthy ("McCarthy"). McCarthy testified that Brown and Bishay showed her the note reflecting their discussion. Bishay testified that he offered to pay Brown the $10,000.00 at that meeting, but Brown told Bishay to wait until he received a typed version of the agreement before he tendered the payment. Brown further testified that the parties intended only to be bound by a written document prepared by their attorneys.

In the early evening of August 1, 2001, Bishay's attorney received a five-page, type-written draft of a formal Forbearance Agreement. The typed agreement added terms to those included on the handwritten note. The agreement sets forth a graduated schedule whereby Bishay would receive a partial refund for removing his property from the premises by set deadlines. The agreement also circumscribes the precise area of the premises Bishay was allowed to occupy, and requires Bishay to obtain BAA's permission before removing items remaining on the first floor. In addition, the agreement states that "[Bishay's] occupancy of the Second Floor shall not in any way be deemed to create or reinstate any tenancy whatsoever and said occupancy shall only be permitted in accordance with this Agreement with the understanding and agreement that the Execution shall be in full force and effect." Additional provisions contained standard contract terms, such as a "time is of the essence" clause.

Most contentious, however, were the release clauses included in the written agreement. Brown testified that he and Bishay had always discussed releases as a part of the agreement, whereas Bishay testified that releases were never discussed until he received the first draft of the

7

typed Forbearance Agreement. Bishay was troubled by the release language because he wished to preserve any potential claims under the earned equity provisions of the P & S. Between August 1, 2001, and when communication broke down the afternoon of August 3, 2001, the parties exchanged numerous drafts. Twenty-one exhibits were introduced at trial reflecting drafts of the agreement, with most of the textual changes focusing on the release language.

McCarthy testified that on July 31, 2001, Brown told her to cancel or delay the eviction because he and Bishay were discussing a possible extension. McCarthy testified that she informed Brown that the cost of cancelling the eviction was approximately $2,500.00. As the parties exchanged various drafts of the agreement, problems arose with support staff and electronic submissions. Bishay's attorney, Steven Gurdin ("Gurdin"), testified that over the period that the parties were negotiating the document, he did not receive revised copies from Brown's attorney, James Singer ("Singer"), as scheduled. On August 3, 2001, Brown informed Bishay that if he did not sign the agreement by noon, Brown would add $2,500.00 to the $10,000.00 figure. If Bishay did not sign the agreement before 4:00 p.m., Brown would levy on the execution. Gurdin testified that he and Singer were in the process of negotiating the release language on the morning of August 3, 2001. Slightly after noon, while Singer's office was working on revising the document, Singer contacted Gurdin and told him that Brown required an additional $2,500.00. Infuriated, Bishay refused to pay the additional $2,500.00. Communication broke down between the parties later that afternoon.

At approximately 7:00 a.m. on Saturday, August 4, 2001, Bishay received a telephone call from the alarm company monitoring the premises informing him that the premises' alarm had sounded. Bishay immediately went to the premises and discovered McCarthy, constables, and a moving company packing his property and evicting him. The moving company had loaded

8

Bishay's antique car collection onto a trailer. Bishay testified that he plead with the constable and moving company to allow him to remove the property, but that they refused to allow him to do so.

The court posed sixteen special questions to the jury. After lengthy deliberation, the jury found that Bishay and BAA entered into a binding contract entitling Bishay to remain on the premises after July 31, 2001. In addition, the jury rejected the argument that after May 31, 2001, Bishay was a tenant at sufferance, thereby denying BAA's counterclaim for use and occupancy, liquidated damages, and expenses. The special question regarding tenancy at sufferance specifically asked the jury whether the Agreement for Judgment encompassed Bishay's June and July occupancy. The jury found that the settlement did include payment for Bishay's June and July occupancy. The jury did not find that any of the defendants intentionally or negligently misrepresented any material facts to Bishay.[3]

## III. Discussion

### A. Breach of Contract

BAA argues that the jury verdict for Bishay on his breach of contract claim must be set aside because, as a matter of law, there was no binding, enforceable agreement for an extension of time between the parties. To resolve this argument, the Court must make two legal determinations. First, whether the evidence introduced at trial was sufficient to support a jury finding that the parties had agreed upon all material terms of the contract at some point between July 30, 2001, and August 3, 2001. Second, whether the agreement is within the statute of frauds

---

[3] Special Questions 4-7 asked the jury to determine whether one or more of the defendants intentionally or negligently misrepresented any material fact to Bishay regarding his ability to remain on the premises after July 30, 2001. The jury answered "NO" to all four of these questions.

9

and, therefore, unenforceable without a signed writing.

### 1. Mutual Assent

Before reaching the statute of frauds argument advanced by BAA, the Court must first consider whether there was sufficient evidence produced at trial from which a jury reasonably could have found that the transactions between the parties had progressed beyond the stage of "imperfect negotiation" to that of the completed contract. *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 217 (1935).

When the parties contemplate executing a final written agreement there is a strong inference in the law that the parties do not intend to be bound by earlier negotiations until all terms are settled and in writing. *Id.* at 216. See *Tull v. Mister Donut*, 7 Mass. App. Ct. 626, 630 (1979). However, every term of the agreement need not be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract. *Lafayette Place Assoc. v. Boston Redevelopment Auth.*, 427 Mass. 509, 517-519 (1998). Where all material terms which are to be included in a future writing have been agreed upon, it may be inferred that the writing is to serve as a convenient memorial of the contract, for whose terms there is already mutual assent. *Rosenfield*, 290 Mass. at 216.

Where the parties present oral evidence to establish the existence and terms of an agreement, it is for the jury to determine both the existence of the contract and its provisions. *Situation Mgmt. Sys., Inc. v. Malouf*, 430 Mass. 875, 880 (2000), citing *Gleason* v. *Mann*, 312 Mass. 420, 423 (1942).

There was evidence produced during the trial from which a jury could reasonably determine that the parties entered into a binding oral agreement whereby BAA granted Bishay a license to remain on the premises after July 31, 2001, in exchange for $10,000.00. Bishay

10

testified that he and Brown agreed to a limited extension of Bishay's occupancy while a lease agreement with either Gallery or Ming's was finalized. Bishay and Brown orally agreed the night of the Gallery meeting that Bishay would have limited use of the premises in exchange for $10,000.00. This agreement was confirmed by a conversation over lunch the next day and memorialized in the handwritten note. The jury reasonably found that the material terms of the agreement concerned the scope of the occupancy and the consideration Bishay would pay for it.

The exchange of drafts between the parties evidenced their intent to formally memorialize the agreement in a writing. The fact that the parties intended such a writing, however, will not defeat the existence of an oral agreement where all material terms have been agreed upon. *Situation Mgmt.*, 430 Mass. at 879-880. From the handwritten note through the various drafts of the formal Forbearance Agreement, the terms governing the area Bishay could occupy and the consideration he would pay for that occupancy remained unchanged. Testimony offered by both parties, as well as the drafts, strongly supports the inference that the release of claims provision was the only term that remained under negotiation.

Although the defendants introduced evidence that material terms remained under negotiation, the jury was entitled to find, based on other evidence introduced at trial, that all material terms had been settled. See *LaBrecque v. Nicochik*, 442 F.2d 1094, 1098 (1st Cir. 1971) (applying Massachusetts contract law). It was reasonable for the jury to find that releases and any other terms added to the written drafts were not central to the oral agreement, but rather collateral details added to the written drafts. While Brown testified that the parties only intended to be bound by a written agreement, Bishay testified, conversely, that he and Brown reached an oral agreement at the Gallery meeting on July 30, 2001. Bishay further testified that he and Brown confirmed the agreement over lunch on July 31, 2001. Resolution of such credibility

11

issues is properly left to the jury. See *Kilham* v. *O'Connell*, 315 Mass. 721, 723-724 (1944).

## 2. Statute of Frauds

A lease of land conveys an interest in the land and transfers possession. *Chase* v. *Aetna Rubber Co.*, 321 Mass. 721, 724 (1947), quoting *Baseball Publishing* Co. v. *Bruton*, 302 Mass. 4, 55 (1939). A lease of land constitutes a sale of an interest in land and therefore requires a signed writing to comply with the statute of frauds.

A license, by contrast, "merely excuses acts done by one on land in possession of another that without the license would be trespass, [and] conveys no interest in land." *Bruton*, 302 Mass. at 55. See also *Willett* v. *Pilotte*, 329 Mass. 610, 612 (1953). A license may be contracted for orally or in writing. *Id.* A license to do an act upon land grants the holder of the license the exclusive right to occupy the land only so far as is necessary to do the act encompassed by the license. *Connors* v. *Knights of Columbus*, No. 98-2356 (Middlesex Sup. Ct. September 30, 1999) (Quinlan, J.), quoting *Stratis* v. *McLellan Stores Co.*, 311 Mass. 525, 529 (1942) (additional citations omitted). A license is also revocable at the will of the possessor of the land. *Bruton*, 302 Mass. at 56. As such, the plaintiff cannot invoke specific performance to enforce a contract for a license. *Id.* at 57. The revocation of the license may, however, constitute a breach of contract giving rise to an action for damages. *Id.* at 56.

The evidence at trial established that the agreement between the parties granted Bishay a license and did not create a tenancy. The documents introduced at trial demonstrate that BAA went to great lengths to avoid characterizing the agreement as a tenancy. The agreement granted Bishay non-exclusive possession of a portion of the premises for a limited period. The written drafts of the Forbearance Agreement require Bishay to obtain permission from BAA to access other parts of the premises in order to remove the antique cars and equipment he was allowed to

12

store there. The agreement did not rise to the level of a leasehold interest, but rather granted Bishay limited access to the premises, for a limited time and for a limited purpose. Thus, as a matter of law, the agreement is not within the statute of frauds and does not require a writing to be enforceable.

### B. Use and Occupancy

As noted above, the defendants' failure to move for a directed verdict at the close of all the evidence precludes this Court from granting their motion for JNOV. If denial of the motion would result in manifest injustice, however, this Court may order a new trial on the defendants' counterclaims. *Szalla*, 37 Mass. App. Ct. at 350.

The defendants contend that the jury verdict with respect to their counterclaim for use and occupancy is erroneous as a matter of law because the Agreement for Judgment settled the summary process action only. However, the written terms of the agreement are unclear as to what the settlement encompassed. In addition, there was conflicting testimony at trial regarding the scope of the summary process action as well as the scope of the settlement. It is worth noting that the defendants did not object to the submission of a special question to the jury on this issue.

The Agreement for Judgment states that the agreement constitutes a settlement of the summary process action only. The agreement does not state, however, what the summary process action encompassed. The summary process complaint itself is not limited to rent due as of the date of filing, April 31, 2001, but also contains a claim for late fees pursuant to the lease terms. Ex. 3. Claims for late fees were thereafter expressly excluded from the agreement and reserved for a later action. Indeed, claims for late fees were the only claims referred to in the agreement by specific language. In addition, the summary process complaint claimed one

13

month's rent and two months' real estate taxes. Ex. 3. Therefore, contrary to the defendants'

contention, neither the summary process complaint nor the Agreement for Judgment is limited to

recovery of "rent due as of filing." In addition, the agreement contained specific provisions

addressing the terms under which Bishay would be allowed to remain on the premises through

the end of July, 2001. Therefore, in this Court's opinion, it is not certain on the face of the

Agreement for Judgment whether or not the damage award included payment for Bishay's

occupancy through July 31, 2001.

Where an agreement is ambiguous, parol evidence is admissible to show the intention of

the parties and to allow the trier of fact to resolve ambiguous terms. *Cullinet Software, Inc.* v.

*McCormack & Dodge Corp.*, 400 Mass. 775, 776 (1987); *Kobayashi* v. *Orion Ventures, Inc.*, 42

Mass. App. Ct. 492, 496 (1997). When a written agreement, as applied to the subject matter, is

in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to

its execution may be shown for the purpose of elucidating, but not of contradicting or changing,

its terms. *Robert Industries, Inc.* v. *Spence*, 362 Mass. 751, 754 (1973). Bishay testified that

the agreement settled all of his lease obligations with BAA. Conversely, McCarthy and Singer,

testifying on behalf of the Defendants, asserted that the agreement represented payment for

approximately two months' rent, approximately two months' real estate taxes, and the

approximate amount Bishay owed in real estate taxes for March of 2001. In addition, the jury

had before it all documents, including the P & S and the Agreement for Judgment, relevant to

determining this issue. Based on the evidence introduced at trial, including testimony and

exhibits, the jury could reasonably conclude from the circumstances surrounding the settlement

that the damage amount set forth in the Agreement for Judgment included payment for Bishay's

occupancy through July 31, 2001.

14

Cases cited by the defendants do not bolster their claim that the settlement of the summary process action, as a matter of law, could not include payment for future occupancy. One such case, *Electrelle Co. v. Maguire*, 215 Mass. 550 (1913), addressed a chattel lessor's right in an equitable replevin action to file successive lawsuits to recover lease payments that fall due after filing of the action. *Electrelle*, 215 Mass. at 551-551. See *Ingram v. Hawthorne*, 1987 Mass. App. Div. 16, 17-18 (Western Dist., February 11,1987) (Dohoney, J.), citing *Electrelle*, 215 Mass. at 551 (subsequent suit for rent accruing after filing of summary process action did not constitute impermissible "claim-splitting").

In light of the fact that the defendants' motions for JNOV on Bishay's breach of contract claim and their counterclaims are denied, the defendants' motions with respect to eviction costs are also denied. In addition, the jury could, after considering all of the evidence, reasonably reject the Defendants' claim for indemnification and liquidated damages arising out of Bishay's breach of the lease.

### C.  Damages

After considering all of the relevant documents and testimony, the jury awarded Bishay $1,175,000.00 in damages ($850,000.00 on his GMAC personal guaranty, $265,000.00 for moving and storage costs, and $60,000.00 for lost wages and profits). BAA challenges this damage award on several grounds. First, BAA argues that the jury's award of damages for Bishay's personal guaranty is excessive because, according to BAA, Bishay became liable under the guaranty prior to the eviction. In support of this argument, BAA points to documents suggesting that Bishay's corporations had defaulted on their financial obligations to GMAC in November of 2000. Second, BAA contends that the jury impermissibly based its damage award with respect to moving and storage costs on improperly admitted hearsay evidence. Lastly, BAA

15

relies on the best evidence rule to support their contention that the damage award with respect to lost wages and profits is against the weight of the evidence. As discussed below, this Court is not persuaded that any portion of the jury's damage award is excessive.

BAA filed what they titled a Motion for Remittitur on the plaintiff's damage award. Regardless of the title used, this Court will consider their motion as one for a new trial.

The ability to order a new trial on the ground of an excessive verdict accompanies the Court's power to set aside the verdict as against the weight of the evidence. *Bartley* v. *Phillips*, 317 Mass. 35, 40 (1944). See also James W. Smith & Hiller B. Zobel, Rules Practice § 59.4, at 443 (1977). When a party asserts a claim that the verdict is against the weight of the evidence, the trial judge should determine whether the verdict, in his judgment, "is so greatly against the weight of the evidence as to induce in his mind the strong belief that it was not due to careful consideration of the evidence, but that it was the product of bias, misapprehension, or prejudice." *International Totalizing* v. *Pepsi Co.*, 29 Mass. App. Ct. 424, 438 (1990), quoting *Scannell* v. *Boston Elev. Ry.*, 208 Mass. 513, 514 (1911).

It is within the trial judge's discretion to determine whether a damage award is against the weight of the evidence. *Loschi* v. *Massachusetts Port Authority*, 361 Mass. 714, 715-716 (1972) (occasions where the Appeals Court will set aside a judge's ruling with respect to remittitur are exceedingly rare because decision within the trial judge's sound discretion). However, a "judge has no right to set aside a verdict merely because he himself would have assessed the damages in a different amount." *Solimene* v. *B. Grauel & Co.*, 399 Mass. 790, 803 (1987). Moreover, motions for a new trial on the theory that the damages were excessive "ought not to be granted unless on a survey of the whole case it appears to the judicial conscience and judgment that a miscarriage of justice will result.'" *Walsh* v. *Chestnut Hill Bank & Trust Co.*, 414 Mass. 283, 292

16

(1993), quoting *Bartley* v. *Phillips*, 317 Mass. 35, 41 (1944). See also *Moose* v. *Massachusetts Inst. of Technology*, 43 Mass. App. Ct. 420, (1992).

  With respect to Bishay's liability on the personal guaranty, the defendants argue that because Bishay's corporate entities had defaulted on their financial obligations to GMAC in November of 2000, Bishay's liability on the guaranty predated the eviction. Consequently, the argument continues, Bishay's personal liability was unrelated to the eviction. However, the evidence introduced at trial supported a finding that even though the corporate entities were in default, GMAC did not trigger Bishay's personal liability until after the eviction. See Ex. 58, 71. While Bishay testified that his relationship with GMAC over the years was a rocky one, the jury could reasonably conclude from the evidence introduced during trial (1) that as of July 2001, some limited business relationship remained between Bishay and GMAC, and (2) that limited relationship was interrupted by BAA's premature eviction. BAA also alleges that the $850,000.00 does not reflect the true amount of Bishay's liability to GMAC. However, documents introduced during trial support the finding that GMAC obtained an $850,000.00 judgement against Bishay, and that GMAC reduced the judgment amount as a set-off to settle a claim that Bishay had asserted against GMAC. See Ex. 71. This Court notes that Bishay was extensively cross-examined with documents relating to his separate GMAC litigation. The jury considered Bishay's testimony as well as all relevant impeachment materials raised by the defendants before making this portion of its damage award. Given that there was sufficient evidence, both oral and documentary, introduced at trial to support the jury's conclusion that the eviction triggered Bishay's $850,000.00 liability on his personal guaranty, this Court cannot conclude that this portion of the verdict amounts to a miscarriage of justice.

  With respect to the hearsay claim regarding Bishay's descriptions during trial of

17

statements by one Kennedy (who ran the moving and storage company), the jury was repeatedly told that they could only consider the statements if they found, by a preponderance of the evidence, that Kennedy was the agent of one or more of the defendants. While no special question was asked about their finding on this agency issue, the law of agency was described to the jury. It is fair to assume, therefore, that in making their damage award for moving and storage costs the jury found Kennedy to be an agent of BAA in carrying out the eviction. Thus, Kennedy's statements bound his principal and were admissible.

With respect to the damage award for lost wages and profits, the best evidence rule simply does not apply. Here, Bishay offered no document to prove his lost wages and profits. Rather, Bishay testified personally to his earnings for prior years. As in any jury trial, the jurors were required to assess Bishay's credibility on this issue and determine the appropriate damages accordingly. See generally Paul J. Liacos, Mark S. Brodin, & Michael Avery, Handbook of Massachusetts Evidence §§ 6.3, 12.6 (7th ed. 1999). This Court also notes that the jury awarded Bishay substantially less for lost wages and profits than he had requested.

This Court may disturb the jury's damage award if "the damages are so great . . . that it may be reasonably presumed that the jury, in assessing them, did not exercise a sound discretion, but were influenced by passion, partiality, prejudice, or corruption." *Bartley*, 317 Mass. at 41 (internal citations omitted). The defendants have not presented any evidence, nor did this judge observe any juror conduct or receive any jury questions, suggesting that the jury awarded damages based on any improper motive, such as partiality or prejudice.[4]

Here, given all of the evidence introduced during trial, including documents and

---

[4] In fact, in my opinion, this jury was conscientious, dedicated, and serious in paying attention during the lengthy trial and in conducting their deliberations.

testimony, this Court does not conclude that the "amount of damages is 'greatly disproportionate to the injury proved.'" *Bartley*, 317 Mass. at 41, quoting *Bodwell* v. *Osgood*, 3 Pick. 379, 385 (1825). See also *Dibiase* v. *Town of Rowley*, 33 Mass. App. Ct. 928, 930 (1992) (rescript).

## ORDER

It is therefore **ORDERED** that the defendants' motion for judgment notwithstanding the verdict on the plaintiff's breach of contract claim is **DENIED**. It is further **ORDERED** that the defendants' motion for judgement notwithstanding the verdict on their counterclaims is **DENIED**. It is also **ORDERED** that Defendant Brighton Avenue Associates LLC's motion for remittitur, treated as a motion for new trial, is **DENIED**.

John C. Cratsley
Justice of the Superior Court

DATED: December *30*, 2004

19